

48-08/PJG

FREEHILL HOGAN & MAHAR LLP
Attorneys for Plaintiff
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax
Peter J. Gutowski (PG 2200)
Gina M. Venezia (GV 1551)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



| | |
|---|---|
| WEALCAN ENTERPRISES INC., | 08 Civ. ____ ( |
| Plaintiff | |
| -against- | **VERIFIED COMPLAINT** |
| CNAN GROUP SpA<br>and CNAN MAGHREB LINES, | |
| Defendants. | |

Plaintiff Wealcan Enterprises Inc. (hereinafter "Wealcan"), for its Verified Complaint against Defendants CNAN Group SpA (hereinafter "CNAN Group") and CNAN Maghreb Lines (hereinafter "CNAN Maghreb") (hereinafter collectively "Defendants" or "CNAN") alleges upon information and belief as follows:

1.      This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure in that it involves a claim for the breach of a maritime contract of charter party. This case also falls under this Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333 and the Court's federal question jurisdiction pursuant to 28 U.S.C. §1331 in that the action arises under the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards, codified at 9 U.S.C. §201 *et seq.* and/or the Federal Arbitration Act, 9 U.S.C. §1 *et seq.*

2.    At all times material hereto, Plaintiff Wealcan was and still is a business entity duly organized and existing under the laws of a foreign country with an address at Calle 50, No. 102, Planta Baja, Panama.

3.    At all times relevant hereto, Defendant CNAN Group was and still is a foreign business entity organized and existing under the laws of a foreign country with an address at 2, Quai No 9, Nouvelle Gare Maritime, Alger Port, 16100, Algiers, Algeria.

4.    At all times relevant hereto, Defendant CNAN Maghreb was and still is a foreign business entity organized and existing under the laws of a foreign country with an address at 74 Boulevard Mohamed V, Alger, Algeria.

5.    On or about January 9, 2004, Plaintiff Wealcan, in the capacity as owner of the M/V MILLENIUM EXPRESS, entered into a maritime contract of charter party with CNAN Group for a period of 12 months which was extended up to June 14, 2007. A copy of the Liner Deep Sea Time Charter dated January 9, 2004, with addenda, is attached as Exhibit A.

6.    In connection with the London proceedings (discussed below), Defendant CNAN Maghreb has asserted that it too is a party to the subject charter party by virtue of Addendum No. 3.[1]

7.    The vessel was duly tendered to Defendants, and Plaintiff Wealcan performed as required under the charter party.

8.    Following the redelivery of the vessel, Plaintiff Wealcan submitted its final hire statement to Defendants showing a balance due in Plaintiff's favor in the amount of $637,516.10 plus an additional amount for the cost of ramps in the amount of EUR350,000 (US $514,500). A copy of Plaintiff Wealcan's hire statement is attached as Exhibit B.

---

[1] Plaintiff disagrees with Defendants' position, but to the extent that Defendants are correct, then Defendant CNAN Maghreb is properly named a defendant herein.

9.    In breach of the terms of the charter party, and despite due demand, Defendants CNAN have refused or otherwise failed to pay the amount due and outstanding and the amount of $1,152,016.10 remains due and owing.

10.    The charter party provides for the application of English law and any dispute arising thereunder is to be referred to arbitration at London, and Wealcan specifically reserves its right to arbitrate the substantive matters at issue.    Arbitration has been commenced and is proceeding.

11.    This action is brought to obtain security in favor of Plaintiff Wealcan in respect to its claims against Defendants CNAN and in aid of London arbitration.

12.    Under English law, including but not limited to Section 63 of the English Arbitration Act of 1996, costs including attorneys' fees, arbitrators' fees, disbursements and interest are recoverable as part of Plaintiff's claim.

13.    This action is further brought to obtain security for the additional sums which are recoverable including Plaintiff's anticipated attorneys' and arbitrators' fees and costs in the London arbitration and interest, all of which are recoverable as part of Plaintiff's claim under English law.

14.    Plaintiff estimates, as nearly as can be computed, that the legal expenses and costs of prosecuting the claim in London arbitration will be $300,000, and interest on its damages are estimated to be $266,000 (calculated at the rate of 7% for a period of 3 years (compounded quarterly), the estimated time for completion of the proceedings in London) including any appeal of any arbitration award issued.

**Request for Rule B Relief**

15.    Upon information and belief, and after investigation, Defendants cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff is informed that Defendants have, or will shortly have, assets within this District comprising, *inter alia*, cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendants CNAN Group SpA and CNAN Maghreb LINES (collectively hereinafter, "ASSETS"), including but not limited to ASSETS as may be held, received or transferred in their own names or as may be held, received or transferred for their benefit, at, moving through, or being transferred and/or wired to or from banking institutions or such other garnishees who may be served with a copy of the Process of Attachment issued herein.

16.    The total amount to be attached pursuant to the calculations set forth above is $1,718,016.10.

WHEREFORE, Plaintiff Wealcan Enterprises Inc. prays:

a.    That process in due form of law according to the practice of this Court may issue against Defendants citing them to appear and answer the foregoing;

b.    That if Defendants cannot be found within this District pursuant to Supplemental Rule B that all tangible or intangible property of Defendants up to and including $1,718,016.10 be restrained and attached, including, but not limited to any cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter

hire, of, belonging to, due or being transferred from or for the benefit of Defendants (collectively hereinafter, "ASSETS"), including but not limited to such ASSETS as may be held, received, or transferred in their own name or as may be held, received or transferred for their benefit, at, through, or within the possession, custody or control of such banking institutions and/or any such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein;

c.     That this Court retain jurisdiction over the matter for any subsequent enforcement action as may be necessary; and

d.     For such other, further and different relief, as the Court may deem just and proper in the premises.

DATED:     New York, New York
           April 29, 2008

                              Respectfully submitted,


                              Peter J. Gutowski (PG 2200)
                              Gina M. Venezia (GV 1551)
                              FREEHILL HOGAN & MAHAR LLP
                              80 Pine Street
                              New York, New York 10005
                              Tel: (212) 425-1900 / Fax: (212) 425-1901
                              *Attorneys for Plaintiff*

## ATTORNEY VERIFICATION

State of New York    )
                       ) ss.:
County of New York  )

       GINA M. VENEZIA, being duly sworn, deposes and says as follows:

1.     I am a partner with the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiff in this action, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2.     The sources of my information and the grounds for my belief are communications, information and documentation provided by our client and/or by solicitors representing our client.

3.     The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

_____
Gina M. Venezia

Sworn to before me this
29th day of April, 2008

_____
Notary Public

HAZEL S. ROSENTHAL
Notary Public, State of New York
No. 01RO4641178
Qualified in Queens County
Certified in New York County
Commission Expires Dec. 31, 2010

# EXHIBIT "A"

WEALCAN ENTERPRISES - INC                    CNAN GROUP - SPA
PANAMA                                       ALGIERS

# LINERTIME DEEP SEA TIME CHARTER

# MILLENIUM EXPRESS

20/01 '04 12:17 FAX 32 3 2221531    INTERNATIONAL SHIP. AG.

45-0

THE BALTIC AND INTERNATIONAL MARITIME CONFERENCE
Open Sea Time Charter (Box Layout 1974)
CODE NAME: "LINERTIME"

| 1. Shipbroker | |
|---|---|
| | 2. Place and date 09.01.2004 |
| 3. Owners/Place of business Wealcan Enterprises Inc., of Panama | 4. Charterers/Place of business CNAN GROUP SPA 2. Quai n° 9, Nouvelle Gare Maritime Alger-port BP 200, Alger Gare |
| 5. Vessel's name Millenhium Express | 6. GRT/NRT 15,074/6098 | 7. Class Polish Register | 8. Indicated horse power 36,000 BHP |
| 9. Total tons d.w. (abt.) on summer freeboard Abt 2500dwt on mean draft 6.20 meters | 10. Quantity of stores, provisions and water not exceeding (tons) Cap. F.O: 300mt MGO 89mt |
| 11. Cubic-feet grain/bale capacity available for cargo 720 Lane Meters, 1040 persons short international | 12. Present position. voys as per existing protocol |
| 13. Speed capability in knots (abt.) on a consumption per 24 hours of (abt.) (See Cl. 52) | 14. Present position. Piraeus - Greece |
| 15. Period of hire (Cl. 1) 12 months from time of delivery (See Cl. 71) + 12 Months charterers options (See Cl. 71) | 16. Port of delivery (also indicate alternative a (a) or (b)) (Cl. 1) Piraeus - Greece |
| | 17. Time for delivery (Cl. 1) See Cl. 50 |
| 18. Number of days' notice of expected date of delivery (Cl. 1) Minimum 20 days | 19. Cancelling date (Cl. 1) See Cl. 50 |
| 20. Trade limits (also indicate alternative (a) or (b)) (Cl. 3) Trading on short international voyages between Mediterranean ports and as per attached schedule "Appendix Number 3" (See cls. 61) | |
| 21. Injurious, inflammable or dangerous goods limited to (also state nature of authorities concerned) (Cl. 4) Nuclear, radioactive, all IMO cargoes are not permitted. | 22. Vessel's cargo handling gear (Cl. 5) One stern door/ramp |
| 23. Fuel consumption in port per 24 hours (abt.) (Cl. 6) 8mt gasoil | 24. Bunker price (indicate alternative (a) or (b) and fixed price if agreed) (Cl. 6) (See cls. 68) |
| 25. Bunkers on delivery (state min. and max. quantities) (Cl. 6) (See cls. 68) | 26. Bunkers on re-delivery (state min. and max. quantities) (Cl. 6) (See cls. 68) |
| 27. Charter hire (also indicate alternative (a) or (b)) (Cl. 7) USD 14.300 perday prorata including deck and engine crew overtime (See cls. 71) | 28. Hire payment (state currency, mode and place of payment, also name, salary and bank account) (Cl. 7) (See cls. 69 & 70) |
| 29. Place or range of re-delivery (Cl. 8) DOP last port within trading range in Charterers option ATDNSHINC: | 30. Number of days preliminary and final notice of port and date of re-delivery (Cl. 8) Minimum 20 days |
| 31. Suspension of hire etc. (indic. no. of consecutive hours) (Cl. 14 (A)) (See cls. 59) | 32. Cleaning of boilers etc. (indicate number of hours) (Cl. 15) |
| 33. Advances (only to be filled in if special agreement made) (Cl. 16) | 34. Overtime (state lumpsum or if other special agreement made) (Cl. 15) Included in daily rate. |
| 35. War (only to be filled in if Section (C), agreed) (Cl. 21) | 36. General average to be settled in (Cl. 24) London-English law to apply |
| 37. Supercargo (state price agreed) (Cl. 23) | 38. Meals (state price agreed) (Cl. 23) |
| 39. Brokerage commission and to whom payable (Cl. 33) 2,5 pct address com. to CNAN deductible from hire. | |
| 40. Numbers of additional clauses covering special provisions, if agreed. Additional cls. 34 to 100 and Appendix 1 to 4 to be deemed part of this charter party. | |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter which shall include Part I as well as Part II. In the event of a conflict of conditions, the provisions of Part I shall prevail over those of Part II to the extent of such conflict.

| Signature (for the Owners) | Signature (for the Charterers) |
|---|---|
| [stamp: ...ES INC PANAMA] | CNAN GROUP - SPA LE DELEGUE GENERAL POUR L'EUROPE |

2

20/01  04 12:18 FAX 32 3 2221534     INTERNATIONAL SHIP. AG.

FROM : DTPDGA     FAX NO. : 0021342325B     Jan. 19 2004 05:00PM P3

"LINERTIME" Deep Sea Time Charter

PART II

It is agreed between the party mentioned in Box 3 as Owners of the Vessel named in Box 4 of the gross/net Register tons indicated in Box 5, classed as stated in Box 7 and of indicated horse power as stated in Box 6, carrying about the number of tons deadweight indicated in Box 6 on Summer freeboard inclusive of bunkers, as stated as stores, provisions and fresh water not exceeding the number of tons indicated in Box 10 having a cubic-feet grain/bale capacity available for cargo as stated in Box 11 exclusive of permanent bunkers, which contain about the number of tons stated in Box 12, and fully loaded capable of steaming fully loaded capable of steaming (about) the number of knots indicated in Box 13 in good weather and smooth water on a consumption of about the number or tons stated in Box 14, and

Period and Port of Delivery  (See cl. 59)

Time for Delivery

Cancelling  (See cl. 50)

Trade  (written readiness)  (and passengers)

(See Box 21)

Nuclear Fuel  (See cl. 21)

Owners to Provide  (See cl. 34)

Charterers to Provide  (See cl. 35)

Cargo Gear  (See cl. 34)     CREW

Cargo Gear Certificate

Bunkers  (boilers, auxiliary engines)

(See cl. 68)

(about same qties as on delivery)

Box 27

Payment  (See Cls. 69-70)

Last Hire Payment  (See Cls. 69)

Re-Delivery

Notice

Cargo Space  (See cl. 36)

Master  (or any number of owrs crew/passed)

(See Cls. 82)

Bills of Lading

Responsibility
The Charterers shall keep and care for the cargo at loading and discharging ports arrange for and tranship and deliver the cargo at destination.

(See cl. 71, 78, 79, 81, 82, 85)

20/01 '04 12:19 FAX 32 3 2221534    INTERNATIONAL SHIP. AG.    @004

FROM : DTPDGA    FAX NO. : 0021342326U    Jan. 19 2004 05:27PM P2

or an accident, sickness of passengers or
Chrts crew on board the vessel after Chrts
sanction if practicable.    Page 3

## «LINERTIME» Deep Sea Time Charter

| | |
|---|---|
| The Charterers shall load, ... discharge the cargo at | 207 |
| their expense under supervision of the Master who shall sign Bills | 208 |
| of Lading as presented, in conformity with Mate's or tally clerk's | 209 |
| receipts. The Charterers shall be responsible for the accuracy of | 210 |
| all statements of fact in such Bills of Lading. | 211 |
| The Owners shall be liable for claims in respect of cargo arising or | 212 |
| resulting from | 213 |
| a) Failure on their part properly and carefully to carry, keep and | 214 |
| care for the cargo while on board. | 215 |
| b) Unreasonable deviation form the voyage described in the Bills of | 216 |
| Lading unless such deviation is ordered or approved by the Char- | 217 |
| terers. | 218 |
| c) Lack of due diligence on their part before and at the beginning | 219 |
| of each voyage to make the Vessel seaworthy but claims arising or | 220 |
| resulting from faulty preparation of the ... of the | 221 |
| Vessel or from bad stowage of the cargo not affecting the trim or | 222 |
| stability of the Vessel on sailing shall be the Charterers' liability. | 223 |
| Except as aforesaid the Owners shall be liable for all cargo | 224 |
| claims. | 225 |
| If the cargo is the property of the Charterers, the Owners shall have | 226 |
| the same responsibility as they would have had under this Clause | 227 |
| had the cargo been the property of a third party and carried under | 228 |
| a Bill of Lading incorporating the Hague Rules. | 229 |
| The Charterers shall be liable for Customs or other fines or penalties | 230 |
| whether or not lawfully levied or imposed, relating to the cargo or | 231 |
| other property of persons carried with Charterer's approval or to | 232 |
| the acts or omissions of the owner of the cargo. **Charterers** | 233 |
| Claims for death and personal injury shall be borne by the Owners | 234 |
| unless caused by the act, neglect or default of the Charterers their | 235 |
| servant or agent including stevedores and all others for whom **Owners** 126 |
| Charterers are responsible under this Charter. | 237 |
| If for any reason the Owners of the Charterers are obliged to pay | 238 |
| any claims, Customs or other fines or penalties, for which the other | 239 |
| party has assumed liability as above, that other party hereby agrees | 240 |
| to indemnify the Owners of Charterers as the case may be against | 241 |
| all loss, damage or expenses arising or resulting form such claims. | 242 |
| However, the Owner's indemnity to the Charterers under this clause | 243 |
| shall be restricted in that amount to which the Owner's liability | 244 |
| would have been limited had they been sued directly. | 245 |
| | 246 |
| **13. Exemptions** | 247 |
| As between the Charterers and the Owners, the responsibility for | 248 |
| any loss, damage, delay or failure in performance of this Charter | 249 |
| not dealt with in Clause 12, to be subject to the following mutual | 250 |
| exception: | 251 |
| Act of God, act of war, civil commotions, strikes, lock-outs, restraint | 251 |
| or princes and rulers, quarantine restrictions. | 252 |
| Further, such responsibility upon the Owners to be subject to the | 253 |
| following exceptions: | 254 |
| Any act or neglect by the Master, pilots or other servants of the | 255 |
| Owners in the navigation or management of the Vessel, fire or ex- | 256 |
| plosion not due to the personal fault of the Owners or their Manager | 257 |
| collision or stranding, unforeseeable breakdown or any latent defect | 258 |
| in the Vessel's hull, equipment of machinery. | 259 |
| The above provisions in no way to affect the provisions as to sus- | 260 |
| pension of hire in this Charter. | 261 |
| **14. Suspension of Hire, etc** | 262 |
| (A) In the event of dry-docking or other necessary measures to main- | 263 |
| tain the efficiency of the Vessel, deficiency of men or Owners' stores, | 264 |
| strike of Master, Officers and Crew, breakdown of machinery, damage | 265 |
| to hull or other accident, either hindering or preventing the working | 266 |
| of the Vessel and continuing for more than the number of con- | 267 |
| secutive hours indicated in Box 31, no hire to be paid in respect of | 268 |
| any time lost thereby during the period in which the Vessel is unable | 269 |
| to perform the service immediately required. | 270 |
| Should the Vessel deviate or put back during a voyage, contrary to | 271 |
| the orders or directions of the Charterers, for any reason other than | 272 |
| accident to the Cargo, hire to be suspended from the time of | 273 |
| her deviating or putting back until she is again in the same or | 274 |
| equidistant position form the destination and the voyage resumed | 275 |
| therefrom. | 276 |

| | |
|---|---|
| Winch breakdown | 277 |
| ... | 278 |
| calculation of above labourers and men lost to be calculated pro | 279 |
| rata for the purpose of such inefficiency in relation to the number of | 280 |
| winches required for work. If the Charterers elect to continue work | 281 |
| the Owners are to pay for shore labourers in lieu of winches, | 282 |
| but in such cases the Charterers to pay full hire | 283 |
| ... | 284 |
| **Detention for Charterers' account** | 285 |
| (B) In the event of the Vessel being driven into port or to anchorage | 286 |
| through stress of weather, trading to shallow harbours or to rivers | 287 |
| or ports with bars or suffering an accident to her cargo, any de- | 288 |
| tention of the Vessel and/or expenses resulting from such deviation | 289 |
| to be for the Charterers' account even if such detention and/or | 290 |
| expenses, or the cause by reason of which either is incurred, be | 291 |
| due to, or to be contributed to by, the negligence of the Owners' | 292 |
| servants. | 293 |
| **Dry-docking** | 294 |
| Owners to give the Charterers at least four weeks notice of their | 295 |
| intention to dry-docking the ship for bottom painting and normal | 296 |
| maintenance work and actual time and place for such dry-docking | 297 |
| to be mutually agreed. | 298 |
| **15. Cleaning Boilers etc.** | 299 |
| Cleaning of boilers or opening of pipes whenever possible to be | 300 |
| done during service, but if impossible the Charterers to give the | 301 |
| Owners necessary time for such work at an interval of not less than | 302 |
| ... | 303 |
| ... | 304 |
| ... | 305 |
| ... | 306 |
| **16. Advances See cl. 69** | 307 |
| The Charterers or their Agents to advance to the Master, if required, | 308 |
| necessary funds for ordinary disbursements for the Vessel's account | 309 |
| at any port charging ... commission, such advances | 310 |
| to be deducted from hire, unless other agreement is made according | 311 |
| to Box 33. | 312 |
| **17. Excluded Ports** | 313 |
| The Vessel not to be ordered to nor bound to enter: | 314 |
| a) any place where fever or epidemics are prevalent or to which the | 315 |
| Master, Officers and Crew by law are not bound to follow the Vessel; | 316 |
| **Ice** | 317 |
| b) any ice-bound place or any place where lights, lightships, marks | 318 |
| and buoys are or likely to be withdrawn by reason of ice on the | 319 |
| Vessel's arrival or where there is risk that ordinarily the Vessel will not | 320 |
| be able on account of ice to reach the place or to get out after | 321 |
| having completed loading or discharging. The Vessel not to be | 322 |
| obliged to force ice, nor to follow ice-breakers when inward bound | 323 |
| If on account of ice the Master considers it dangerous to remain | 324 |
| at the loading or discharging place for fear of the Vessel being | 325 |
| frozen in and/or damaged, he has liberty to sail to a convenient | 326 |
| open place and wait the Charterers' fresh instructions. | 327 |
| Detention through any of above causes to be for the Charterers' | 328 |
| account. | 329 |
| **18. Loss of Vessel** | 330 |
| Should the Vessel be lost or missing, hire to cease from the day | 331 |
| when she was lost. If the date of loss cannot be ascertained half | 332 |
| hire to be paid from the date the Vessel was last reported until the | 333 |
| estimated date of arrival at the destination. Any hire paid in ad- | 334 |
| vance to be adjusted accordingly. | 335 |
| **19. Overtime** | 336 |
| The Vessel to work day and night if required. The Charterers to | 337 |
| ... Owners a lumpsum hire per 30 days as indicated in Box 34 or pro rata | 338 |
| for any overtime ... Officers and Crew, unless either agreement, it | 339 |
| ... | 340 |
| **20. Lien** | 341 |
| The Owners to have a lien upon all cargoes and sub-freights be- | 342 |
| longing to the Time-Charterers and any Bill of Lading freight for | 343 |
| all claims under this Charter, and the Charterers to have a lien on | 344 |
| the Vessel for all moneys paid in advance and not earned. | 345 |
| The Charterers will not suffer, nor permit to be continued any lien | 346 |
| or encumbrance incurred by them or their Agents, which might have | 347 |

4

20/01 '04 12:20 FAX 32 3 2221534    INTERNATIONAL SHIP. AG.

FROM : DTPDGA    FAX NO. : 00213423268    Jan. 19 2004 05:23 PM P3

Page 4

## «LINERTIME» Deep Sea Time Charter

priority over the title and interest of the Owners in the Vessel.   348

**21. Salvage**   349
All Salvage and assistance to other vessels to be for the Owners'
and the Charterers' equal benefit after deducting the Master's and
Crew's proportion and all legal and other expenses including hire
paid under the Charter for time lost in the salvage, also repairs of
damage and fuel consumed. The Charterers to be bound by all
measures taken by the Owners in order to secure payment of salvage
and to fix its amount.   350–355

**22. Sublet**   356
~~The Charterers to have the option of subletting the Vessel, giving
due notice to the Owners, but the original Charterers always to
remain responsible to the Owners for due performance of the
Charter.~~   357–360

**23. War**   361
(A) The Vessel unless the consent of the Owners be first obtained
not to be ordered nor continue to any place or on any voyage nor
be used on any service which will bring her within a zone which
is dangerous as the result of any actual or threatened act of war,
war, hostilities, warlike operations, acts of piracy or of hostility or
malicious damage against this or any other vessel or its cargo by
any person, body or State whatsoever, revolution, civil war, civil
commotion or the operation of international law, nor be exposed in
any way to any risks or penalties whatsoever consequent upon the
imposition of Sanctions, nor carry any goods that may in any way
expose her to any risks of seizure, capture, penalties or any other
interference of any kind whatsoever by the belligerent or fighting
powers or parties or by any Government or Ruler.   362–375

(B) Should the Vessel approach or be brought or ordered within
such zone, or be exposed in any way to the said risks.   376

1) The Owner to be entitled from time to time to insure their interests
in the Vessel and/or hire against any of the risks likely to be in-
volved thereby on such terms as they shall think fit, the Charterers
to make a refund to the Owners of the premium on demand; and   377–380

2) notwithstanding the terms of Clause 14 hire to be paid for all
time lost including any loss owing to loss of or injury to the Master,
Officers or Crew or to the action of the Crew in refusing to proceed
to such zone or to be exposed to such risks.   381–385

(C) In the event of the wages and/or war bonus of the Master, Officers,
and/or Crew or the cost of provisions and/or stores for deck and/or
engine room and/or insurance and/or war risk insurance premiums
being increased by reason of or during the existence of any of the
matters mentioned in Section (A) the amount of any increase to be
added to the hire and paid by the Charterers on production of the
Owners' account therefor, such account being rendered monthly.   386–391

(D) The Vessel to have liberty to comply with any orders or directions
as to departure, arrival, routes, ports of call, stoppages, destination,
delivery or in any other wise whatsoever given by the Government
of the nation under whose flag the Vessel sails or any other Govern-   392–396

ment or any person (or body) acting or purporting to act with the
authority of such Government or by any committee or person having,
under the terms of the war risks insurance on the Vessel the right
to give any such orders or directions.   397–399

(E) In the event of the outbreak of war (whether there be a declara-
tion of war or not) between any two or more of the following coun-
tries: the United Kingdom, the United States of America, France, the
Union of Soviet Socialist Republics, The People's Republic of China   400–403

in the event of the nation under whose flag the Vessel sails be-
coming involved in war (whether there be a declaration of war
or not)   404–407

either the Owners or the Charterers may cancel this Charter, where-
upon the Charterers shall re-deliver the Vessel to the Owners in ac-
cordance with Clause 8, if she had cargo on board after discharge
thereof at destination or if detained under this clause from reaching
or entering it at a near open and safe port as directed by the
Owners, or if she has no cargo on board, at the port at which she
then is or if at sea at a near open and safe port as directed by the
Owners. In all cases hire shall continue to be paid in accordance
with Clause 7 and except as aforesaid all other provisions of this
Charter shall apply until re-delivery.   408–417

(F) If in compliance with the provisions of this clause anything is   418–419

done or in not done, such not to be deemed a deviation.   420

Section (C) is optional and should be considered deleted unless
agreed according to Box 35.   421–423

**24. General Average**   424
General Average to be settled in the place stated in Box 36 according
to York/Antwerp Rules, 1974. Hire not to contribute to General
Average.   425–427

**25. Fumigation    (See Cls. 37)**   428
Expenses in connection with fumigation and/or quarantine ordered
because of cargoes carried or ports visited while the Vessel is
employed under this Charter to be for the Charterers' account. Ex-
penses in connection with all other fumigations and/or quarantine
to be for the Owners' account.   429–433

**26. Funnel Mark    (See Cls. 46)**   434
~~The Charterers shall have the option of painting the Vessel's funnel
in their own colours, but the Vessel to be re-delivered with the
Owner's colours. Painting and repainting to be for the Charterers'
account and time to count. The Charterers shall have the option
of flying their own flag during the currency of this Charter.~~   435–438

**27. Supercargo**   439
The Charterers to have the option of placing a Supercargo on board,
~~he paying at the rate stated in Box 39 per day for victualling and
accommodation. The Master to~~   440–443

**28. Meals**   444
~~The Owners to victual pilots and Customs officers and also, when
authorised, by Charterers or their Agents, in victualling clerks,
stevedores' foremen, Charterers or stevedores, the Charterers paying
the Owners at the rate stated in Box 41 per meal, for all such victualling.~~   445–447

**29. Light**   448
The Owners to supply light on deck and in holds, as on board at
all times, free of expense to the Charterers, unless electrical clusters
from shore are compulsory, in which case same to be for the
Charterers' account.   449–452

**30. Stevedoring Damage    (See Cls. 86)**   453
~~The Owners to instruct the Master to report in writing to the Super-
cargo, if on board, and to the Charterers and/or their Agents, in
port involved, about any stevedoring damage caused to the Vessel.
Such reports to be made immediately after the damage is done
unless the damage could not be detected at once in spite of close
supervision of the stevedoring.~~   454–459

**31. Ballast**   460
~~If any ballast is required, all expenses for same, including trimming
in loading and discharging, to be for the Owners' account.~~   461–463

**32. Arbitration**   464
Any dispute arising under the Charter to be referred to arbitration
in London, one Arbitrator to be nominated by the Owners and the
other by the Charterers, and in case the Arbitrators shall not agree,
then to the decision of an Umpire to be final and binding upon
them to be final and binding upon
award of the Arbitrators or the Umpire to be final and binding upon
both parties.   465–469

If either of the appointed Arbitrators refuses to act, or is incapable
of acting, or dies, the party who appointed him may appoint a new
Arbitrator in his place.   470–472

If one party fails to appoint an Arbitrator, either originally, or by
way of substitution as aforesaid, for seven clear days after the other
party, having appointed his Arbitrator, has served the party making
default with notice to make the appointment, the party who has
appointed an Arbitrator may appoint that Arbitrator to act as sole
Arbitrator in the reference and his award shall be binding on both
parties as if he had been appointed by consent.   473–479

**33. Commission**   480
~~The Owners to pay a commission at the rate stated in Box 39 to the
party mentioned in Box 39 on any hire paid under the Charter, but
in no case less than is necessary to cover the actual expenses of
the Brokers and a reasonable fee for their work. If full hire is
not paid owing to breach of Charter by either of the parties the
party liable therefor to indemnify the Brokers against their loss of
commission.~~   481–487

Should the parties agree to cancel the Charter, the Owners to in-
demnify the Brokers against any loss of commission but in such
case the commission not to exceed the brokerage on one year's
hire.   488–492



5

Rider Clauses to the Charter-Party entered into between Wealcan Enterprises Inc. and CNAN on 09.01.2004 for the charter of the P/C Ferry Millennium Express .

34.    Owners to provide and pay for all deck and engine Officers and Crew as with a complement of about 30.

Any / all overtime worked by Owners' Officers and Crew will be for Owners' account.

Owners are to pay for all wages, consular charges and all other expenses in connection with the Master, Owners' Officers and Owners' Crew and for all deck and engine room stores and insurance of the vessel, including but not limited to maintenance and class surveys.

Owners will ensure that throughout the Charter, the vessel shall be properly manned as above and maintained in her class and in a thoroughly efficient state (as per class requirements) in hull and machinery, and equipment of every kind as set out in the description of the vessel and  passenger accommodation in Appendix 1 and 2 of this Charter Party.

Owners to provide all necessary lashing and securing material including trailer stands, for full cargo of cars, buses, trucks or trailers. Charterers to provide additional and / or replacement lashing materials for their account.

Vessel to be delivered with hull and superstructure, decks and garage/car decks spaces clean, with a full and complete inventory of all the requisite furniture, fittings and equipment in a good, clean and operable state and aspect. Thereafter and during the whole duration of the Charter Party period, the part of the vessel managed by Charterers to be kept by Charterers under their own expense and responsibility, in such good, clean and reliable condition. Charterers, when they notice any deficiency , except normal wear and tear, undertake to repair / replace it as the case may be immediately after occurrence or request Owners to carry out the necessary works, Charterers or Owners' responsibility to be always determined.

Any damages or deterioration caused by passengers and / or Charterers' personnel to be entirely the Charterers' responsibility and will be put right at Charterers' expense.

35.    The Charterers will provide for Charterers Catering Crew of approved Nationality holding certificates as required by SOLAS, vessel's flag, Public Health, port state and International requirements for reception, offices, shops, bars, casino, restaurants, galley and for servicing of passengers' cabins etc. The Charterers' catering crew will be embarked on board at Charterers sole risk and responsibility in respect of wages, insurance and any other costs, charges and services related to their employment and victualing. The carriage of provision and stores to the store rooms to be for Charterers' account.

36.    The whole reach and burden of the vessel, including lawful deck capacity and car deck capacity, also passenger accommodation and facilities



> Rider Clauses to the Charter-Party entered into between Wealcani Enterprises Inc. and CNAN on
> 09.01.2004 for the charter of the P/C Ferry Millennium Express.

including shops and reception, also passenger services to be at Charterers'
disposal. Owners also put at Charterers' disposal free space in Crew
compartments, which will not be sued by Owners' own Crew for Charterers'
catering Crew minimum 74 beds. Owners undertake to give the necessary
instructions to allow the use by Charterers' Crew of Owners' Crew recreation
areas, smoke rooms, rest rooms whether separately or commonly shared
(Owner's cabin to be utilized by Charterers upon request if it is available). All
reefer spaces and storerooms to be at Charterers' disposal, except for a
separate reefer space and store room for owners' crew. Owners may use the
vessel's main galley for the cooking needs of their Crew, in coordination with
Charterers crew.

37.    Charterers to supply at all time during the charter period valid
certificates of and statements of disinfections and fumigation of the vessel.
Any disinfect ion / fumigation caused by Charterers' personnel on board
passengers, passengers' effects or cargo carried or ports visited during the
currency of this Charter Party to be at Charterers' time and expense.

38.    Owners to supply all lighting apparatus as far as are on board,
according to IMO rules.

39.    The Owners' confirm the appointment of a cabin-services engineer, an
electrician, plumber, and carpenter who are engaged in maintaining the vessel
in good order during operations. Owners' liaison officer on board will
maintain an established system of daily written checklists of repairs on a
continuous basis.
Charterers' Chief Purser / Supercargo to represent the Charterers and act on
their behalf.
All cleaning products and material (i.e. soap, etc) except for bridge, engine
and owners crew spaces, for Charterers' account.
It is strictly agreed that all Charterers' Crew whilst employed by them are
under the direction, control, and authority of the Charterers' Senior Officer on
board but ultimately to Owners' Master and all Charterers' Personnel are to
follow Master's instructions without question. The daily routine of the
Charterers' Crew will be under the direction of the Charterers' Senior Officer
on board but the Master has the authority to overrule the Charterers' Senior
personnel when, in his opinion (and after written complaint giving the facts
and copied to Charterers' Head Office) acceptable standards are not
maintained in terms of safety discipline, cleanliness or working practices.

The Owner's officers and crew will be uniformed at all times at Owner's
expense when on duty or visible to passengers and Charterers Crew to be
likewise uniformed at Charterers' expense. The whole Crew to be subject to

20:01  04 12:22 FAX 32 3 2221534    INTERNATIONAL SHIP. AG.                  ⓧ003 a.e

FROM : BTPDGA                    FAX NO. : 0021342326B            Jan. 19 2004 AL:.32PM P

Rider Clauses to the Charter-Party entered into between Western Enterprises Inc. and CNAN on
09.01.2004 for the charter of the P/C Ferry Millennium Express .

the Master's final discipline as regards to alcohol consumption, passenger
contact, and general behavior which to be strictly adhered to by Charterers
and Owner's Crew alike.

40    Oily wastes, sludge tanks, engines / boilers maintenance leftover to be
always removed by Owners' at their cost.  Compulsory watchmen and
compulsory garbage collection to be for Charterers account.

41.  A ) Passengers' tickets and contracts (samples to be submitted to owners
for their perusal before present come into force) will be issued by the
Charterers' at their expense and under their responsibility.  Charterers shall
not issue tickets, exceeding the vessel's certifications.

B.) Charterers' shall be responsible for the fulfillment of their obligations
under passengers' contract, any claim from passengers under such contract,
or otherwise or form any other person on board in the service of the
Charterer, shall be the responsibility of Charterers.

C.) If claims, as mentioned here above in paragraph B should have been
paid by the Owners, same to be indemnified the soonest possible by the
Charterers for their full payment, but not later than the next hire payment.

42.    The opening and closing of vessel's doors and the operation of the
vessel's ramps to be effected by qualified men from Owners' Crew. Owners
confirm that the vessel is fitted with one stern ramp.
Should any damage to the doors and / or ramps occurs and such damage
continues unrepaired for 4 consecutive hours and obstruct Charterers
operation, the Charterers may declare the vessel off hire, except if such
damage is due to Charterers, Charterers' servants or passengers; in this latter
case, Charterers will be fully responsible. Should obstruction of the Charterers
operation has been caused by owners fault, then from the time the vessel is
declared off hire by Charterers owners to participate equally with Charterers
(i.e. 50% each) to cover solely and strictly the reasonable expenses made by
Charterers for Hotel, Restaurant and Traveling of Passengers but owners
participation liability is hereby limited to U.S.Dollars 2,500.00 maximum to be
born as from the time the Charterers declare the vessel off hire. Should any
amount be payable in excess of maximum owners liability (i.e. U.S.$ 2,500.00)
for any reason whatsoever then same shall be solely on account of Charterers
without liability or obligation whatsoever of the owners to the Charterers or
any third party.

43    Fresh water to be for Charterers' account. Master to follow Charterers'
reasonable instructions regarding the use of fresh water.
Fresh water for the use of Owners' Crew to cleaning / sweeping of decks /
engine stores / provisions to be supplied and paid for by the Charterers.




Rider Clauses to the Charter-Party entered into between Wealean Enterprises Inc. and CNAN on 09.01.2004 for the charter of the P/C Ferry Millennium Express.

44     Vessel dry-docked and passed annual survey on February 2004. All further dry-docks, special surveys during the currency of the Charter Party, shall be scheduled according to class/flag regulations as well as in case of emergency affecting vessel's seaworthiness and on request of the Classification Society.

45     Master to perform necessary ballast maneuvering to keep vessel in stability during loading / discharging operations within ship's capabilities.

46     Charterers to have the privilege of flying their own house flag. Charterers' have the option to paint ship's funnel and vessel's sides with their colors and marks, Owners undertake upon Charterers request to paint ship's funnel and vessel's sides with their colors and marks, at their time and cost.
At redelivery of the vessel to the Owners, Charterers have the option to, either restore Owners marks at their time and cost, or deliver the vessel with Charterers marks and pay a compensation of USD 4,000.00 to Owners.

47     Vessel to listen to radio stations as required by authorities. The wireless installations on board, telephone and GMDSS station to be at the service of Charterers, against payment of costs of their own messages and calls. Master to make statement of Charterers calls and charges every month  with supporting receipts signed by Charterers representatives and to be settled by Charterers with the next hire payment.
Master to give the benefit of broadcasting of press news in the French language to passengers as far as equipment permits.

48     Owners' Officers and Crew to comply with vaccination and sanitary regulations in all ports of call and corresponding certificates to be available on board, otherwise any detention and fines resulting from not having these certificates on board to be for Owners' account. Should obstruction of the Charterers operation has been caused by owners fault, then from the time the vessel is declared off hire by Charterers owners to participate equally with Charterers (i.e. 50% each) to cover solely and strictly the reasonable expenses made by Charterers for Hotel, Restaurant and Traveling of Passengers but owners participation liability is hereby limited to U.S.Dollars 2,500.00 maximum to be born as from the time the Charterers declare the vessel off hire. Should any amount be payable in excess of maximum owners liability (i.e. U.S.$ 2,500.00) for any reason whatsoever then same shall be solely on account of Charterers without liability or obligation whatsoever of the owners to the Charterers or any third party



9

Rider Clauses to the Charter-Party entered into between Wealean Enterprises Inc. and CNAN on 09.01.2004 for the charter of the P/C Ferry Millennium Express .

49      It is understood that the Master, or his Officers, shall assist and supervise carefully the stowage of the cargo and passengers' cars, offering their cooperation for the optimum utilization of all designated spaces (passengers and cars).    Charterers' Officers / Purser / supercargo shall supervise the embarkation, berthing of passengers and disembarkation.

50      The vessel shall be delivered between February 15th to March 1st 2004, ATDNSHINC owners option .
Place of delivery: Piraeus, Greece
Date of canceling : March 1st ,2004

51      Should the vessel be arrested and / or detained during the currency of this Carter Party on the basis of a claim directly and strictly connected with the Owners and / or the vessel and / or the vessel's managers by any person having or purporting to have a claim against the vessel / Owners / managers and / or any of their assets, hire under this Charter Party shall not be payable in respect of any period whilst the vessel remains under such arrest or detention. Owners undertake to release the vessel from arrest immediately. Should obstruction of the Charterers operation has been caused by owners fault, then from the time the vessel is declared off hire by Charterers owners to participate equally with Charterers (i.e. 50% each) to cover solely and strictly the reasonable expenses made by Charterers for Hotel, Restaurant and Traveling of Passengers but owners participation liability is hereby limited to U.S.Dollars 2,500.00 maximum to be born as from the time the Charterers declare the vessel off hire. Should any amount be payable in excess of maximum owners liability (i.e. U.S.$ 2,500.00) for any reason whatsoever then same shall be solely on account of Charterers without liability or obligation whatsoever of the owners to the Charterers or any third party . In case the vessel is not released of such arrest or detention within seven days, then Charterers have the option to either terminate this contract with no further claim from either party or renegotiate the remainder of the charter period.

52. During the currency of this Charter-Party, if the speed of the vessel be reduced and / or the fuel oil / Gas oil consumption be increased, the time lost and the cost of any extra fuel oil / Gas oil consumed shall be deducted from the hire with no further claim from either party.
The maximum speed of the vessel is 23 knots and the maximum service speed of the vessel from full away (disembarkation of pilot) until the next stand by of pilot station, as directed by Charterers is 21 (twenty one) knots at 85 % of the vessel's maximum main engines output MCR in good weather conditions within the Mediterranean climate temperatures. Evidences of weather conditions to be taken from vessel's deck logbooks and independent weather

10

Rider Clauses to the Charter-Party entered into between Wealcan Enterprises Inc. and CNAN on 09.01.2004 for the charter of the P/C Ferry Millennium Express.

bureau reports (Ocean routes / Meteorological offices) to be taken as ruling and will be binding on both parties.

For the purpose of this Charter-Party, good weather conditions are to be taken with a wind speed not exceeding BEAUFORT FORCE 4 (four) and or DOUGLAS SEASTATE 3 (three).

Owners undertake and agree to sail the vessel in excess of the above service speed exceptionally and temporarily in case of need and weather and vessel conditions permit so as to make up for any lost time and catch up with Charterers' fixed schedule. Any additional Fuel Oil / Gasoil consumed for this purpose to be for Charterers' account.

In case of engine damage obstructing Charterers operation, not be repaired within 07 consecutive hours as from Charterers operation schedule time, the Charterers may declare the vessel Off-Hire with no further claim from either party.

If during the currency of this Charter-Party the speed of the vessel is reduced and / or the fuel oil consumption increased so that the vessel's operations are not completed or voyages lost, the time lost and the cost of any extra fuel consumed should be deducted from hire with no further claim from either party.

The maximum service speed of the vessel is given for 21 knots speed at 70 tons Fuel oil 180 CST + maximum 8 tons Gas oil per day, during voyage, in good weather condition within the Mediterranean climatic / temperatures as per Charter Party.

Moreover, if vessel's speed drops continuously and for more than three (3) consecutive voyages (under good weather conditions) to 15 (fifteen) knots or below, such speed may be considered inoperable for Charterers' service / schedule as attached (Appendix no 3). Owners undertake to immediately rectify the defect and endeavor to properly repair the breakdown, if any. Should obstruction of the Charterers operation has been caused by owners fault, then from the time the vessel is declared off hire by Charterers owners to participate equally with Charterers (i.e. 50% each) to cover solely and strictly the reasonable expenses made by Charterers for Hotel, Restaurant and Traveling of Passengers but owners participation liability is hereby limited to U.S.Dollars 2,500.00 maximum to be born as from the time the Charterers declare the vessel off hire. Should any amount be payable in excess of maximum owners liability (i.e. U.S.$ 2,500.00) for any reason whatsoever then same shall be solely on account of Charterers without liability or obligation whatsoever of the owners to the Charterers or any third party

Charterers have the right to prematurely redeliver the vessel with no further claims from either party.

Should Charterers' elect to maintain the vessel in service, this will be done after Owners' and Charterers' mutual agreement on a reduction of the daily hire of the vessel.

Rider Clauses to the Charter-Party entered into between Wealcan Enterprises Inc. and CNAN on 09.01.2004 for the charter of the P/C Ferry Millennium Express .

53.  A.  Any additional/movable equipment put on board by Charterers to remain their property and where applicable to be well taken care of by vessel's Officers and Crew, fair wear and tear excepted.
Charterers' equipment's put on board to be listed and list of same to be handed over to and signed by the Master acknowledging safe receipt on board.

B.  Vessel to be delivered with 3 (three) sets of linen, sheets (under sheets / over sheets), pillow cases, enough blankets, napkins, small and shower towels, table cloths and sufficient crockery, cutlery, glassware for her full passenger capacity, in cabins, saloons, restaurants, self-service, bars, for day and night ferry service (Appendix number 4).

C.  Galley, pantries, sculleries, dish-washing areas and arrangements to be adequately fitted and equipped with the requisite reliable utensils, tools, fittings, and appliances including a large freezer (as on board) as is necessary for the night passenger service, sufficient for vessel's full load of passengers and crew in cabins and economic class.
Owners undertake to deliver such equipment, fittings, appliances are in good and operable and reliable working condition throughout the whole duration of the Charter-Party.
D.  Restaurants / bars / cafeteria / night-club to be suitably equipped including but not limited to three espresso-coffee machines and one filter-coffee machine, reefer cupboards, ice-makers, cold trays, stereo hi-fi system.
All inventories and equipment taken over on delivery to be redelivered to Owners at the expiration of the Time-Charter in the same good order and condition as delivered, normal wear and tear excepted. Charterers to remain responsible for all major items such as furniture, fittings etc..
It is mutually agreed, that whenever it appears necessary, a survey is to be held on board in the presence of Owners' and Charterers' representatives in order to apportion responsibility and a written statement be issued, this procedure to apply whenever a shortage or damage is reported at any time during Charter-Party.

Charterers will have the option either to pay or replace the missing or damaged items. Owners invoice prices to apply.

54  Laundry expenses for passengers, Owner crew/personnel, and Charterers' personnel to be for Charterers' account.

55  Vessel is covered with (H+M) insurance. Present basic war insurance premium to be for Owners' account. Any extra war insurance premium or

12

Rider Clauses to the Charter-Party entered into between Wealcan Enterprises Inc. and CNAN on 09.01.2004 for the charter of the P/C Ferry Millennium Express.

Crew war bonus caused by the trade in which the vessel is engaged to be for Charterers' account.

As a condition precedent of this charter, Charterers' to arrange their own insurance cover, acceptable to owners, for cargo, passengers / staff and third parties liabilities. Evidence to owners that entry is in place and in force and that premiums and other payments necessary to maintain such entries in effect during the period of this charter have been paid. Mortgagees will have their interests noted on all P&I insurance/insurers for Charterers and Concessionaires as well as Owners, to issue letters of undertaking in such form as Mortgagees may reasonably require.

56    The Charterers to indemnify and hold harmless the Owners from and against all losses and damages including fines, penalties and costs occasioned by smuggling on board the vessel by persons other than members of the owners' crew.

57    Owners have the right to run their own canteen for their own Crew under Owners' control / supervision.

58    Owners declare that their government's license for the fulfillment of this Charter-Party is granted, if such license is required.

59    Owner to deliver the vessel ready for immediate ferry / passenger service with a valid passenger safety certificate as per existing protocol for 1040 persons (including crew) in short international voyages within Mediterranean ports and vice versa as per SOLAS, class and flag requirements.
Vessel to have on board on delivery all CLASS / IMO and FLAG certificates, valid for the period of this Charter-Party and will comply with SOLAS 74 and subsequent amendments for car passenger ferries.
In the event of a reasonable delay not exceeding 07 hours (as per box 31 ) to the vessel's operation schedule caused by an event requiring a class visa, Owners undertake to repair same immediately after occurrence and arrange for its survey by Class without delay and the vessel shall be Off-Hire, as from the expiration of 07 hours with no further claim from either party. Should obstruction of the Charterers operation has been caused by owners fault, then from the time the vessel is declared off hire by Charterers, owners to participate equally with Charterers (i.e. 50% each) to cover solely and strictly the reasonable expenses made by Charterers for Hotel, Restaurant and Traveling of Passengers but owners participation liability is hereby limited to U.S.Dollars 2,500.00 maximum to be born as from the time the Charterers declare the vessel off hire. Should any amount be payable in excess of maximum owners liability (i.e. U.S.$ 2,500.00) for any reason whatsoever then

13

Rider Clauses to the Charter-Party entered into between Wealcen Enterprises Inc. and CNAN on 09.01.2004 for the charter of the P/C Ferry Millennium Express.

same shall be solely on account of Charterers without liability or obligation whatsoever of the owners to the Charterers or any third party

The Owners shall procure that both the Vessel and the "Company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code during the currency of this Charter Party. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

60.    The following appendixes herewith attached shall be deemed to be part of this Charter Party:

Appendix  1  : Description of vessel (all details about) latest SOLAS.

Appendix 2 :  Vessel's detailed cabins' plan (Owners' to supply updated drawings).

Appendix  3  : Charterers detailed schedule / timetable service for this C/P.

Appendix   4   :  Inventory list to be compiled by Owners and signed on delivery.

61.    According to vessel's class regulations, vessel is sufficiently fitted with safety equipment in all vessel's compartments and whole spaces on board (all decks, cabins, public areas etc...) which to be with no limitations whatsoever at Charterers and / or their Officers / Crew and / or their passengers, clients, personnel and / or their cargo full disposal at any time during the currency of this  Charter-Party  and  according  to  vessel's  intended  trade  (short international voyages) passenger  and  car-ferry  liner  regular  service between Mediterannean ports ~~where the vessel shall perform an average of~~ ~~.... (..) single voyages per week and each voyage not to exceed~~ ~~approximately ........ miles~~ and shall not affect the maintenance schedule of the vessel.

62.    If war breaks out in the country of the vessel's flag, or country where Owners and / or Charterers have their business or involving as actual participants and / or countries where the vessel according to Charterers scheduled trade the vessel is to be directed, both Charterers and Owners to have the option of canceling this Charter-Party without any damage or liability for either party.

63     Vessel is covered with P & I CLUB named "THE AMERICAN CLUB ". In the event of legally enforceable cargo claims due to Owners' fault at port (s) of call that could result in the vessel's arrest or detention or delay, Owners' will provide acceptable guarantee through their P & I CLUB. In the event of legally enforceable cargo claims due to Charterers' fault at port (s) of call that

9

Rider Clauses to the Charter-Party entered into between Wealcan Enterprises Inc. and CNAN on 09.01.2004 for the charter of the P/C Ferry Millennium Express .

could result in the vessel's arrest or detention or delay, Charterers will provide acceptable guarantee through their P & I CLUB.

64      Charterers to nominate their own Agents at all Ports of call. At ports of call, Charterers' Agents to undertake normal ship's husbandry on Owners' behalf. Repatriation tickets, hospital and doctor's fees spent on Owners' Crew and Officers / cash to Master (see clause 16) to be deducted from next hire.

65      Any damages to cars / trailers / passengers / catering Crew or any other person or cargo taken on board by the Charterers to be insured and covered by the Charterers except if caused by vessel and / or her fittings and / or Owners personnel / servants.
Vessel is not to be responsible for damages to third party property or persons aboard the vessel unless caused by proven negligence of the Owners' Crew.

66      Vessel to have on board the necessary sea-charts for Charterers' intended trade.

67      At the time of delivery and respectively redelivery, Owners' and Charterers' will hold a joint on and off-hire survey to ascertain condition of vessel, check inventory of equipment's and ascertain quantity of fuel oil and gas oil remaining on board. Each party will appoint one surveyor who between them will agree upon the conditions and quantities. The surveyors will sign and agree a joint survey report, each party to bear its own expenses. At delivery, the survey to be held in Charterers' time and at redelivery in Owners' time.

68      The vessel to be delivered with minimum 50 MT IFO, 15 MT MGO and 15 MT LUBOILS on board which to be paid for at Owners last invoice together with the first 30 days hire. The vessel to be redelivered with about same quantity as on delivery and to be debited at the prices of Charterers last invoice.
Master and chief engineer to order the required quantities of bunkers well in advance leaving ample time to Charterers' and their suppliers to stem and deliver the bunkers and always keeping a safety margin to allow vessel to sail and safety reach the next port of call should there be a delay or an impediment timely supply the vessel with the bunkers required.
The fuel oil and Gas oil which Charterers will supply to the vessel during the currency of this charter-party to comply with E.U standards.

69      Hire to be paid without any discount or set off, less agreed advances, less approved payments of Owners' disbursements without further agreement provided that Charterers have made the requested payment pursuant to

15

'01 04 12:27 FAX 12 3 2221534    FAX NG. : 0021342268    Jan. 19 2004

FROM : DTPDGA

Rider Clauses to the Charter-Party entered into between Wealcan Enterprises Inc. and CNAN on 09.01.2004 for the charter of the P/C Ferry Millennium Express.

owners request and supporting sufficient evidence in English and/or English translation is attached to the respective voucher to be issued , every 30 (thirty) days in advance.

The last hire payment shall be paid for the remaining period to the estimated date of termination in accordance with Charterers' redelivery notice and less agreed advances, less approved payments of Owners' disbursements.

Final settlement of accounts between Charterers and Owners will be made within 45 (forty-five) days of vessel's redelivery to Owners.

Any money paid by Charterers' to Owners in advance and not earned by Owners such as but not limited to premature redelivery, Off-Hire, advances, penalties paid by Owners consent on behalf of Owners', to be reimbursed to Charterers' prior to vessel's redelivery/departure.

70    Payment of hire to be made net in cash, in free transferable US Dollars, free of any bank charges, without discount, every 30 (thirty) days in advance as per Clause 69 above to Messrs.:

RECEIVING BANK NAME :    KREDIETBANK NEW YORK
BENEFICIARY BANK NAME:    KREDIETBANK LUXEMBURG
43, BOULEVARD ROYAL
2955 LUXEMBURG RC LUX B 6395
BENEFICIARY NAME:    WEALCAN ENTERPRISES INC.
BENEFICIARY ACC. NO.:    5224434144

In case the full amount of respective hire or any other amount due is not actually credited to the Owners' above mentioned  account on the due date, Owners have the  right to immediately  withdraw  the  vessel  from  service without any notice to Charterers' or other formalities whatsoever.

However owners acting in good faith shall not withdraw the vessel from Charterers service at an exceptional case of delay in payment of hire, always not exceeding ten (10) continuous days and before giving 48 hours Notice of withdrawal to Charterers. Should Charterers fail to take necessary steps to secure that hire shall arrive at owners account on time as hereinbefore agreed for two continuous months or twice during the Charter period the above grace period given by owners to the Charterers in good faith shall not be in force and owners have the right to immediately withdraw the vessel from service without any notice to Charterers' or other formalities whatsoever.

Owners to render to Charterers' monthly in arrears a list of all substantiated expenditures for Charterers' account and any other substantiated additional charges which are for Charterers' account. Such costs are to be possibly offset against Owners' costs due to Charterers' or paid the latest with the next hire payment.

11

Rider Clauses to the Charter-Party entered into between Wealcan Enterprises Inc. and CNAN on 09.01.2004 for the charter of the P/C Ferry Millennium Express.

71.    The Owners' let and the Charterers' hire the vessel for a 12 months period starting as from the date of delivery of the vessel and lasting 365 days thereafter plus 365 days thereafter at Charterers option to be declared in writing four (4) months in advance.

72     The Charterers not to assign the charter or to sublet the vessel without the prior written consent of the Owners which the Owners shall have unfettered discretion to withhold.

73     Owners to arrange for ship's dispensary which to be equipped as per regulations for short international voyages. Only medical supplies and disposable to be supplied by Charterers for their doctors' use in treatment of passengers.

74     The Owners' to allow the free use by Charterers' and/or their servants and/or their agents and/or passengers of all equipment's/facilities on board including but not limited to running and/or operating the duty-free shops at any time, day and/or night by Charterers at their risk and expense and/or their nominees with no interference from Owners crew/personnel.

75.    In order to comply with international safety regulations Charterers shall provide on delivery that a necessary number of the Charterers' catering Crew will be holders of the necessary life-boat/life raft certificates.

76.    Deleted

77.    Deleted

78     Owners are only to be responsible for damage/loss or theft to vehicles and/or to Charterers' personnel/clients and/or passengers' properties loaded on the vessel if proven to have been caused by Owners' Crew members and/or Owners' hereunto.    Visible signs declining carriers' liability to unattended baggage and loss of valuable items must be shown in all vessels' public areas/spaces/cabins to be arranged by Charterers at their cost.

Master to coordinate with Charterers' before delivery and during the currency of this Charter-Party to establish the best system for car decks security.

79.    The securing of cargo inside containers, trailers and other articles of transport to be entirely the Charterers' concern and responsibility. Vessel not to be responsible for consequences of bad stowage or lashing inside units of transport.

Rider Clauses to the Charter-Party entered into between Wealcan Enterprises Inc. and CNAN on 09.01.2004 for the charter of the P/C Ferry Millennium Express.

80.     Owners to tender to Charterers a list of cable expenses, with vouchers, sent for Charterers' account. The Charterers' shall make good these expenses and cost to be offset against Owners expenses. Cables concerning vessel's maintenance and Owners' Crew operations to be for Owners' account.

81.     The Charterers have the right to carry articles of transport equipment with refrigeration machines which are electrically driven and which connect to the vessel's power supply.  Owners to be responsible only if refrigerating vessel's power supply machines are conforming to vessels power supply and have the proper complying units.
The Owners shall be responsible for the supervision of the proper connection of articles of transport to the vessel's supply and ensure they are in operation. The Owners will undertake to procure the functioning of these points and the Crew to check and maintain vessel's power system during the voyage.
Vessel is not liable for the consequences of failure of reefer equipment not provided by the vessel.

82.     Charterers to be responsible for the issuing of all Bill of Lading waybills, booking notes and passenger tickets. New Both to Blame Collision clause and New Jason clause to be incorporated in the Charter-Party. At all times the carrier is the Charterer and will be identified as Carrier on all documents of carriage issued under this Charter-Party. The Hague rules and linertime war clause to be incorporated in all issued bills of lading.

83.     All running/managing of vessel's bars / restaurants / cafeteria / duty free shops / provisions / stores / procurements / sales / transactions onboard will be handled, supervised, and controlled by Charterers' personnel only without interference of whatsoever nature from Owners' crew and/or personnel.
Only Charterers' personnel will handle passenger cash transactions. The Charterers' personnel are responsible for all on board sales for the safe keeping of all cash. The Owners are only to be responsible for losses if due to proven theft or damage by members of Owners' Crew.

84.     Charterers will provide all foodstuff and beverages for passengers and all victuals for Charterers Crew.  Charterers to provide foodstuff and beverages according to GCA carte, as same has been faxed by owners to and accepted by Charterers free of charge to owners' crew.

85.     The Vessel's air-conditioning plant, equipment's, compressors etc. are to be continuously maintained in an efficient state and condition so as to provide at any time and without interruption the required appropriate temperature inside all vessel's passenger and crew compartments, cabins,

20/01 '04 12:28 FAX 32 3 2221534    INTERNATIONAL SHIP. AG.

FROM : DTPDGA                      FAX NO. : 00213423268        Jan. 19 2004 05:...

Rider Clauses to the Charter-Party entered into between Wealcan Enterprises Inc. and CNAN on 09.01.2004 for the charter of the P/C Ferry Millennium Express.

public areas, spaces. For any deficiency, Owners' undertake to immediately expedite and carry out the necessary repairs and supply the required spares to avoid protracted discomfort to passengers.

86.    Charterers will be responsible for stevedore damage to the vessel provided the master has advised Charterers in writing within 24 hours of said damages. Should it possible, in case of stevedore damage, Master will obtain an admission of liability from stevedores in writing. Master to arrange a joint survey with Charterers or their Agents at earliest opportunity to evaluate damage unless damage has been repaired in the meantime. Master will at all times take all precautions to avoid damage to the vessel.
All correspondence concerning damage will be forwarded to Charterers as soon as possible. Any damage that does not affect the seaworthiness or class of the vessel to remain for, accumulated repairs during next scheduled dry-docking. Charterers pay for the actual damage repairs and for time and bunkers. Any repairs affecting seaworthiness or class for which Charterers are liable, to be repaired immediately in Charterers' time and expense.
Charterers' to remain responsible for damages to the vessel or her fittings caused by passengers on board, passengers' baggage or Charterers' personnel embarked on vessel, provided that Master has notified in writing the Charterers' senior personnel onboard and a joint survey has been held to establish extent of damages.

87.    During the currency of this Charter Party, any expenditure to be incurred by Charterers on Owners' behalf must be requested in writing by Master, Managers or Owners' Agents in order to be deducted from hire.

88.    Charterers to provide Master with voyage abstracts, port log, engineers abstracts, Off-Hire reports, stevedore damage reports, dunnage / material reports in English. Those reports to be completed in full and delivered to Charterers' representatives on completion of each voyage.

89.    Charterers may request the Owners to make alterations or modifications to the passengers and public areas of the vessel and to her furniture, facilities and equipment. Any such approved by Owners, alteration shall be at Charterers time and expense.

90.    Should the vessel be Off-Hire for a period of minimum 10 (ten) consecutive days, except if such Off-Hire is due to Time Charterers, the Charterers to have the option of canceling the remaining period of Charter Party without any claims against the Owners.

20/01 '04 12:29 FAX 32 3 2221534    INTERNATIONAL

FROM : DTPDGA                    FAX NO. : 00213423268        Jan. 19 2004

Rider Clauses to the Charter-Party entered into between Wealcan Enterprises Inc. and CNAN on 09.01.2004 for the charter of the P/C Ferry Millennium Express.

91    Charterers or their stevedores at their expense and time under Master's / Officers' supervision and control for security purposes will do all the lashing work.

92.    All Notices and communication shall be in writing sent by fax, courier or certified mail and shall be deemed received when sent:

To the Owners: WEALCAN ENTERPRISES INC. – PANAMA
         C/O
         M. DALAKOS – I. FASSOLIS – N. THEOFANOPOULOS LAW
OFFICES
         15, SACHTOURI STR – PIRAEUS – GREECE.
         TEL. 0030210-4284680
         FAX: 0030210 - 4183015
         E-MAIL: dftlaw@otenet.gr

To the Charterers: CNAN GROUP SPA
         DIVISION TRANSPORT DE PASSAGERS
         CNAN MAGHREB LINES – DIRECTION COMMERCIALE
         2, QUAI No 9, NOUVELLE GARE MARITIME, ALGER PORT
         BP 200, ALGER GARE
         TEL. 00213 21 423208
         FAX: 00213 21 423268
         E-MAIL: dg@cnan-dz.com

93.    Tugboat assistance charges in ports shall be for Charterers even when tugboat use is compulsory by port rules.

94.    All procurements, bunkers, provisions, equipment's ordered by Charterers for their own account to be under the sole responsibility of Charterers and Owners will not be held liable for claims made by the supplier in relation to the above. All Charterers documents shall be ordered, invoiced and marked in the name of Charterers. Likewise, Charterers' will not be held liable for any claims arising from suppliers in relation with the vessel for services/supplies ordered and/or provided for Owners' account. *Invoices and delivery notes will bear- vessel's stamp marked "for Charterers' account" and should be issued in the name of the Charterers stating "without responsibility of the vessel and her owners and managers". Should the issuing supplier deny signing under- such note before delivery of the goods the master should be justified to refuse permission of delivery to the vessel.*

95    Owners undertake all cabins and Pullman seats must be numbered; plans to be given to Charterers'. Charterers undertake to provide fuel oil, gas



19/01 '04 MON 17:46    [TX/RX NO. 7786]

20/01 '04 12:29 FAX 32 3 2221534    INTERNATIONAL SH

FROM : DTPDGA    FAX NO. : 03213423268    Jan. 19 2004

Rider Clauses to the Charter-Party entered into between Wealcan Enterprises Inc. and CNAN on
09.01.2004 for the charter of the P/C Ferry Millennium Express.

oil and lub oil suppliers' analysis at each time of supply bunkers to the vessel
during the period of this Charter-Party. Charterers are responsible for the
bunkers to be supplied to the vessel against owners but owners' servants
must control it and advise Charterers accordingly.

96    The Charter shall be governed and construed in accordance with
English law (see clause 32).

97    Deleted.

98. In the event that unmanifested narcotic drugs are found in the
wheels/chassis/outside perimeter of the trailers / containers or in the
possession of Charterers personel, same to be Charterers responsibility.

99.    Owners shall have no obligation to substitute the vessel with another
vessel in case of lengthy stoppage caused from any reason whatsoever but the
Charterers should then decide as per terms of the C/P whether they wish to
continue or not. Owners shall have the right to sell the vessel within the
charter period and finish this charter without compensation or liability to the
Charterers on the anniversary of the date of commencement of this c/p
provided that sixty days written notice has been given to the Charterers.

100. Fixture to be kept private and confidential.

FOR THE OWNERS                              FOR THE CHARTERERS

WEALCAN ENTERPRISES INC.                    CNAN GROUP - SPA
PANAMA
                                            LE DELEGUE GENERAL
                                            POUR L' EUROPE

19/01 '04 MON 17:46  [TX/RX NO 8296]

# ACCESS FERRIES S.A

## ADDENDUM TO C/P OF THE FERRY MILLENNIUM EXPRESS
## &
## CNAN GROUP SPA

Dated 09 January 2004

Date 23 January 2003:

We hereby agreed the following:

The charterers CNAN GROUP SPA extend the C/P from 12 months to 13 months

Access ferries S.A reduce the daily hire from USD 14,300 to USD14,000.

FOR ACCESS FERRIES S.A

ACCESS FERRIES S.A.
ΛΙΛΧΕΙΡΙΣΗ - ΕΧΜΕΤΑΛΛΕΥΣΗ - ΚΑΘΑΛΟΝ ΠΛΟΙΩΝ
ΧΑΡ, ΤΡΙΚΟΥΠΗ & ΣΕΡΕΜΠΙΚΗ
ΤΗΛ. 4296160-1 ΓΑΞ 4322147
Α.Φ.Μ 9882318 Δ.Ο.Υ. ΠΛΟΙΩΝ

FOR CNAN GROUP SPA

LE DÉLÉGUÉ GÉNÉRAL
POUR L' EUROPE

**22**

**ADDENDUM No 1. TO THE CHARTER PARTY OF M/V MILLENNIUM EXPRESS DATED 09.01.2006 ENTERED INTO BY AND AMONG WELCAN ENTERPRISES INC AND CNAN GROUP SPA.**

This Agreement is made this 13th day of January 2006

### BY AND AMONG

1. **WELCAN ENTERPRISES INC.,** a corporation organized and existing under the laws of the Republic of Panama (Hereinafter called together "the Owners").
2. **CNAN GROUP SPA,** a corporation organized and existing under the laws of Algeria (hereinafter called "the Charterer");

### WHEREAS

"WEALCAN" is the owner of the m/v MILLENNIUM EXPRESS, a ferry boat of 15,074 grt, built 1974 registered in the ownership of WEALCAN under Panama flag at the port of Panama and chartered by the Charterer under the terms and conditions of a Liner time Charter Party dated 09th January 2006.

### NOW IT IS HEREBY AGREED AS FOLLOWS

1. The text "48 months from time of delivery (See clause 71)" stated in Box 15 is deleted and replaced by the following: "13 months commencing as from May 15, 2006, plus 13 months, plus 13 months, plus 13 months at Charterers option (See Clause 71).

2. Clause 71 is deleted and replaced as follows: "71. The Owners' let and the Charterers' hire the vessel for a 13 months period starting as from May 15, 2006 and lasting 395 days thereafter at a daily rate of United States Dollars 14. 280, plus 395 days thereafter at a daily rate of United States Dollars 14. 280, plus 395 days thereafter at a daily rate of United States Dollars 14. 280, plus 395 days thereafter at a daily rate of United States Dollars 14.280 at Charterers option to be declared in writing four (4) months in advance in each case of extension."



23

3. Charterers undertake to repay to the Owners the amount of United States Dollars 316,000.00 spent by the later for the construction of inner rump in the vessel pursuant to the instructions of the Charterers. This amount, in case the Charterers shall exercise all their options relating to the extension of the Charter period provided in Box 15 and in Clause 71, shall be paid by adding on top of the daily hire the amount of United States Dollars 200.00 per day in the same manner and under the same terms provided by clause 70 of the Charter Party for the Payment of Hire that is applicable in full in this case. Should the Charterers fail to exercise all or any of their options relating to the extension of the Charter period provided in Box 15 and in Clause 71, then the Charterers should pay upon redelivery of the vessel the amount of United States Dollars 316,000.00 less any amount already paid till then as herein above provided.

4. Each of the parties hereby represents and warrants to the other party that it has the power and authority to enter into this addendum, to perform and observe the terms of it and to do all things which are contemplated by the present and the execution and delivery of and the performance and observance of the terms of the present by such party has been validly authorised by all appropriate corporate and other action and all obligations expressed to be assumed by such party in or pursuant to the present Addendum are legal, valid and binding obligations of such party and are and will be direct, unconditional and general obligations of such party.

5. All other terms and conditions and exceptions of the Charter party shall remain in full force and effect.

6. This Addendum shall be kept strictly private and confidential.

7. This Addendum shall constitute an inseparable part of the aforementioned Charter Party and is drawn up in two originals of



2

24

even tenor and date, of which one Original shall be retained by
the Sellers and one Original shall be retained by the Buyers.

IN WITNESS the hands of the duly authorized representatives of the
parties hereto the day and year first above written.

Signed for and on behalf of             Signed for and on behalf of
**WELCAN ENTERPRISES INC.**              **CNAN GROUP SPA**

By:                                      By:

Le Directeur Commercial

O. BOUAOUICHE

3

25



# CNAN Group Spa

# ADDENDUM N° 2 DATED 2005 MARCH 15TH

### To the charter party dated 2004 January 09th C/F MILLENNIUM EXPRESS
### between CNAN Group Spa Division Transport de Passagers
### & ACCESS FERRIES SA

It has been mutually agreed between both parties what follow:

1. CNAN DTP exercises their option concerning the chartering of the above named vessel for 13 months.

2. The hire for the new period beginning from March 23rd 2005 is increased with 200 US dollars daily. This additional amount represent the cost of the ramps put on board for increase the quantity of cars to be transported. The cost of these ramps is shared on an intended period of charter of 5 years.

3. The charterers have the option to keep the vessel under charter for another period of 52 months. The hire for the extended period will be increased by 4% annually, starting from April 2006. This option must be declared latest by June 01st 2005.

4. If at the end of the charter party, the option is not declared, and charterers decide to redeliver the vessel, the remaining cost of the ramps is due to owners and must be paid by charterers with the last period of hire.

All the other clauses of the charter party remain in force and to apply

Issued in Algiers on March 15th 2005

FOR ACCESS FERRIES

FOR CNAN Group Spa
DIVISION TRANPORT DE PASSAGERS

Le Directeur Commercial

O. BOUAOUICHE

S.P.A. au capital social : 8.000.000.000 DA
Siège Social : 2, quai n°9, Nouvelle Gare Maritime Alger Port
BP 200, ALGER GARE
E-mail:dg@cnan-dz.com - Site Web: http://www.cnan-dz.com

Tél.: std 021 42 31 75 - 021 42 31 63
021 42 31-80/87
Tél. :     213 21 42 31 74

26



# CNAN Maghreb Lines

## ADDEMDUM N° 3 DATED  JANUARY 13TH 2006
## TO THE CHARTER PARTY DATED January 9TH 2004

It has been mutually agreed between both parties what follow:

1. Due to the off hire occurred in this fixture, the period of the time charter is extended to the equivalent duration of the off hire, counting from the initially agreed redelivery date, which means 06th 2006 02h00 am.
2. The charter party is renewed for a period of 13 months starting from June 06th 02.00 am 2006, plus 1 period of 13 months, plus 1 period of 13ths months, plus 1 period of 13 months, plus 1 period of 13 months in charterer's option.
3. The hire for this new period will be increased by 2%, representing US$ 280 daily.
4. If at the end of the charter party, the option is not declared and the vessel is redelivered from charterer to owners, the remaining cost of the ramps is due to owners and has to be paid with the last period of hire.
5. The addenda n° 1 & 2 remain in force and to apply as well as all other terms and conditions of the charter party.

Issued in Algiers on January 13th 2006

FOR ACCESS FERRIES

FOR CNAN Maghreb Lines

Le Directeur Commercial
O. BOUAOUICHE

27

# CNAN Maghreb Lines

## ADDEMDUM N° 4 DATED JANUARY 13TH 2006
## TO THE CHARTER PARTY DATED January 9TH 2004

It has been mutually agreed between both parties what follow:

1. Due to the off hire occurred in this fixture, the period of the time charter is extended to the equivalent duration of the off hire, counting from the initially agreed redelivery date, which means 06th 2006 02h00 am.
2. The charter party is renewed for a period of 13 months starting from June 06th 02.00 am 2006, plus 1 period of 13 months, plus 1 period of 13ths months, plus 1 period of 13 months, plus 1 period of 13 months in charterer's option.
3. The hire for this new period will be increased by 2%, representing US$ 280 daily.
4. The hire for first period as well as for each additional new period for which the charterer will take the option, will be increased by 280 US$ representing 2% of the initial hire.
5. If at the end of the charter party, the option is not declared and the vessel is redelivered from charterer to owners, the remaining cost of the ramps is due to owners and has to be paid with the last period of hire.
6. In view that CNAN group Spa has recently opened in the market its share capital, and regardless of the new folder(s) who might be concerned with the passenger activities, all the terms and conditions of the present charter party are to remain in force and to apply in full.
7. The addenda n° 1 & 2 remain in force and to apply as well as all other terms and conditions of the charter party.

Issued in Algiers on January 14th 2006

FOR ACCESS FERRIES

ACCESS FERRIES S.A.

FOR CNAN Maghreb Lines



Le Directeur Commercial
O. BOUAOUICHE

29